## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **MARK LABARRE** | ) |
| **and** | ) |
| **KRISTIN LABARRE** | ) |
|     Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES OF AMERICA, LAURIE MONTAGUE,** | ) |
| **M.D., INDIVIDUALLY AND IN HER CAPACITY AS AN** | ) |
| **EMPLOYEE OF THE VETERANS HEALTH** | ) |
| **ADMINISTRATION AT THE VETERANS** | ) |
| **ADMINISTRATION MEDICAL CENTER, MANCHESTER** | ) |
| **NEW HAMPSHIRE, VERMONT OR INDEPENDENT** | ) |
| **CONTRACTOR THERETO, AND NURSE PRACTITIONER** | ) |
| **KIM HANNAFORD, INDIVIDUALLY AND IN HER** | ) |
| **CAPACITY AS AN EMPLOYEE OF THE VETERANS** | ) |
| **HEALTH ADMINISTRATION AT THE VETERANS** | ) |
| **ADMINISTRATION MEDICAL CENTER, MANCHESTER,** | ) |
| **NEW HAMPSHIRE** | ) |
|     Defendants | ) |

### <u>COMPLAINT</u>

NOW COMES Mark LaBarre, by and through his attorney, and respectfully states the

following:

### <u>PARTIES:</u>

1.    Mark Labarre ( hereinafter referred to as "Mark") resides at 25 Cedar Street, Hopkinton,

Merrimack County, New Hampshire 03229.  Mark is a veteran who received services at

the Veteran Administration facility at 718 Smyth Road, Manchester, New Hampshire.

2.    Kristin LaBarre (hereinafter "Kristin") resides at 25 Cedar Street, Hopkinton, Merrimack

County, New Hampshire.  She is married to and lives with Mark LaBarre (hereinafter

"Mark").

3.    The United States of America, through its Department of Veterans Affairs, provides healthcare services to eligible military veterans at medical centers and outpatient clinics located throughout the country.

4.    The Veterans Health Administration (hereinafter referred to as "VHA") is the component of the United States Department of Veterans Affairs (hereinafter referred to as  "VA") responsible for implementing the healthcare program of the VA through the administration and operation of  Veterans Administration Medical Centers (hereinafter referred to as  "VAMC"), Outpatient Clinics ( hereinafter referred to as "OPC"), Community Based Outpatient Clinics (hereinafter referred to as "CBOC"), and VA Nursing Home) Programs.  The headquarters of the Veterans Health Administration is the Veterans Affairs Building, 810 Vermont Avenue, NW, Washington, D.C.

5.    The VHA's responsibilities  include the administration and operation of a VAMC located at 718 Smyth Road, Manchester, Hillsborough County, NH 03104 (hereinafter referred to as "MVAMC").

6.    Laurie Montague, MD (hereinafter "Montague") is a physician who was employed by, or under contract with,  the Veteran Administration to provide medical services.  At the time of the incident, she was assigned to the Veteran Administration Medical Center  located at 718 Smyth Road Manchester, NH 03104.   Dr. Montague's last known residence was at 32 Jonathan Drive, Wilmot, Merrimack County,  NH 03287 and her last known business address was 814 Hicks Blvd. Fairfield, Butler County,  OH 45014.

7.    Kim Hannaford (hereinafter referred to as "Hannaford") is nurse practitioner who, at the time of the incidents described herein, was, and is believed to still be, employed by VHA.

treating patients at the MVAMC.  Ms. Hannaford's last known residence address is 247

Manning Street, Needham, Norfolk County, Massachusetts, 02492.

**AMOUNT IN CONTROVERSY**

8.  As  fully detailed elsewhere in this Complaint, the amount in controversy is

$2,587,310.46.

**JURISDICTION**

9.  This action is being brought against the United States, Department of Veterans Affairs

and Veteran Health Administration,  pursuant to the Federal Torts Claims Act,

28 U.S.C. §§ 1346 (b), 2671 et seq. (hereinafter referred to as the "FTCA").

10.  Administrative review was sought and a Form 95 submitted to the Department of

Veterans Affairs.  A copy of the denial letter was mailed to counsel on October 6, 2020

and is attached hereto as Exhibit 1.

**FACTS**

11.  The LaBarres have been married for 30 years.  They are the parents of two adult

daughters, and the grandparents of one grandson.

12.  Mark has been receiving his medical care from the VA for over twelve years.

13.  Even though his primary care provider changed over the years, since at least as early as

2009, Mark had been maintained on Atenolol as part of his medical care.

14.   Mark was prescribed Atenolol for borderline hypertension and to reduce the stress which

was causing  hypertensive vessels in his eyes.

15.  On January 4, 2018, Mark was seen at MVAMC by Montague in her capacity as the

primary physician assigned to him by the VHA.

16.     After Montague reviewed Mark's medical history, she advised him to discontinue taking Atenolol **immediately** [emphasis added].  At no time did Dr. Montague inform Mark of any adverse effects that may, could, or would result by the immediate cessation of the Atenolol .

17.     Unknown to Mark at the time, under the FDA  guidelines, Atenolol is not to be discontinued without titration, no matter how low the dose, and is considered a "Black Box" drug.[1]

18.     Montague indicated she would refer Mark to a specialist for his eyes because she did not understand why he was on the medication.  Notwithstanding her admission she had no idea why the medication had been prescribed for many years, she abruptly discontinued it without contacting the orignal prescribing department and without making any attempt to determine why Mark had been maintained on the medication for over 10 years.

19.      Montague did not disclose the to Mark the  possible consequences of abruptly stopping the medication, and it is unknown whether it was because she was unaware of the possible consequences of abruptly stopping the medication, or due to her failure to provide the information required to obtain Mark' s informed consent for the abrupt cessation of the medication.  Montague did not schedule Mark for a followup visit with her or any other primary care provider.

20.     Within ten (10) days of Mark's appointment with Montague, he began to feel exhausted and ill.  In addition, he developed a red, raised, blister like rash on his face for which he

---

[1]     American College of Cardiology referencing FDA Guidelines and Black Box Label on Atenolol

was seen on January 17, 2018, by Kim Hannaford, Nurse Practitioner  at Urgent Care at the Veteran Administration Medical Center in Manchester, New Hampshire (hereinafter 'UCMVAMC').

21.     Nurse Practitioner Hannaford  mis-diagnosed the rash as a bacteria folliculitis, making no reference to his medication change or apparently without considering it as the source of Mark's rash.

22.     In spite of the evaluation performed at Urgent Care, and,  based upon his other symptoms, Mark believed he was suffering from additional medical problems.  For that reason, on January 17, 2018  he went to Montague, his primary care doctor, requesting she, or another physician see him.   Neither Montague nor any other primary care physician saw or evaluated Mark;  rather, they referred him to  dermatology.

23.     That day, Mark went from his primary care doctor's office to dermatology where he was told  he could not be seen because he did not have a referral.  However, that evening, after he had left the MVAMC, the dermatology department called  Mark and indicated they had found his referral.  No dermatology appointment was scheduled that day and, in fact, it was not until February 5, 2018 that Dermatology scheduled Mark for an appointment for February 7, 2018. However, on February 6, 2018 at 8:00 p.m., without providing a reason, the MVAMC called,  cancelled, and did not reschedule the appointment with Dermatology .;

24.     On February 8, 2018, pursuant to the January 4, 2018 referral from Montague, Mark was seen at the MVAMC in ophthalmology by Kenny Chen, MD and Andrew DiMattina, OD. Dr. Chen diagnosed Mark with mild hypertensive retinopathy and possible central serious

chorioretinopathy, corroborating his earlier diagnosis of hypertensive vessels in his eyes. Although a copy of Dr. Chen's report and diagnosis was forwarded to Montague, she did not follow up.

25. On February 12, 2018, four days after his appointment with Dr. Chen and 39 days after being taken off Atenolol, Mark had a spontaneous terminal cardiac event at work.

26. Mark was taken from work by ambulance to St. Joseph's Hospital in Nashua, NH. Upon his arrival in the Emergency Room, an EKG and cardiac catherization were performed by Dr. Beaupre (hereinafter "Beaupre") of the New England Heart Center.

27. Beaupre indicated Mark's spontaneous cardiac incident was electrical in nature and referred him to Dr. Beaudette (hereinafter "Beaudette") of the New England Heart Center (hereinafter "NEHC") for evaluation and the placement of a defibrillator.

28. While Mark was being transported to St. Joseph's Hospital, Kristin she received a telephone call at work indicating Mark had an "incident". Her distress was compounded when she was subsequently told Mark had "died" but had been "resuscitated" after prolonged efforts at defibrillation at his job site.

29. On or about February 13, 2018, the MVAMC, specifically the Patient Care Coordinator, and Montague's office were notified about Mark's cardiac event and admission to St. Joseph's Hospital. Mark advised her his physician from the NEHC wanted him to have a defibrillator placed on February 15, 2018.

30. On February 14, 2018, Mark was advised by the VA they were unable to transfer him to the Boston Veterans Administration in order for the VA to do the surgery in a timely fashion. As a result, Mark was told the surgery should be performed at St. Joseph's

Hospital and the VA would pay for it.

31.     The defibrillator was placed on by Dr. Beaudette on February 15, 2018.

32.     Mark was hospitalized at St. Joseph's Hospital for five days, during which time Kristin

remained with him, not returning to work the entire time.

33.      As a further result of this incident, Mark was unable to drive for 3 months.  Kristin drove

him to his appointments as often as possible, attending all that she could.  In addition, she

had to juggle her own pelvic injections and physical therapy for her Interstitial Cystitis

with Mark's appointments. Kristin picked Mark up from work on her days off and

arranged for someone else to pick him up on the days she had to work.

34.     Approximately two months after Mark's cardiac event, he was informed Montague had

been discharged from the VAMC after a peer review was concluded;  Montague's

discharge was later confirmed by a patient care coordinator.

35.     On March 6, 2018, Mark saw Mark Sughrue MSN, ARNP (hereinafter "Sughrue")  in

consultation.  At that appointment,  it was noted Montague had made an erroneous entry

into Mark's  medical records, one she contradicts elsewhere in the same note, concerning

an issue  never discussed with her, in what appears to be an attempt to use this alleged

problem  as a cover up for her cessation of the Atenolol.

36.     During the March 6, 2018 consult, Sughrue also stated  in part, the spontaneous terminal

episode was "a possibility of catecholamines storm after discontinuation of Atenolol with

onset of rash".

37.     On May 8, 2018, following an MRI performed on April 12, 2018, Mark was diagnosed

with an electrical heart issue by Mark Greenberg, MD.

38.    Mark continued to be exhausted following cardiac evaluation and care.  He was seen by his primary care doctor, William Siroty, M.D, and, on April 16, 2018 he completed a sleep study.  Mark also began attending counseling on November 26, 2018 with clinical psychologists Kevin O'Leary, PsyD and John Lynch, clinical psychologist, for, as his VA records reveal, anxiety, depression and PTSD associated with his cardiac event.  On February 13, 2019, Mark was placed on citlopram and bupropium by Penny Kane, ARNP, PNP, BC.  In spite of his treatment, Mark's symptoms continue.

39.    Since the incident, Kristin has been under tremendous stress**.**  She has supported Mark emotionally and physically.  She has cared for his physical and mental health needs and has offered him support as he became more depressed and developed  PTSD, while coping with her own nightmares as well.  This has effected her both physically and mentally.  Because of her own disease, it is important for her stress to stay low in order for her pain to maintain a tolerant level.

40.    As a result of the cardiac event, Kristin and Mark's lives have changed dramatically.  Although the LaBarre's had an active social life before the incident, Mark no longer wishes to socialize and his condition has had an effect on their intimacy. Their schedules have changed as well.  Because of the need to be in bed early, once Kristin returns from work, they are in bed within two hours and do not spend as much time together; as a result, they spend less than 30 awake hours together a week.

41.    In addition, Kristin has had to do all of the shopping and take care of all of the household tasks. Kristin had to do all of the shopping and take care of all of the household tasks including, but not limited to cleaning, laundry, dishes, shopping, snow blowing and lawn

care.

## COUNT I:          LAURIE MONTAGUE, M.D. WAS NEGLIGENT IN  HER TREATMENT OF MARK LABARRE

42.      Paragraphs 1 - 41 are incorporated herein by reference.

43.      Montague was employed by, or under contract with,  the VA,  providing medical services to individuals being seen/treated at the MVHMC at the time of the incidents giving rise to this lawsuit.

44.      Mark is a veteran, and, as such, was, and is entitled to receive medical care through the VA's medical facilities and clinics operated by the VHA.

45.      Montague was Mark's treating primary physician at the time of the within described incident.

46.      Montague had a doctor-patient relationship with Mark.

47.      As Mark's physician, Montague owed a duty of care to Mark.

48.      In treating Mark, Montague had a professional duty to provide competent care consistent with the standard of care.

49.      Montague informed Mark she was unaware of the reason he had been placed on Atenolol.

50.      Montague failed to determine or learn the reasons Mark had been placed on Atenolol.

51.      Montague abruptly discontinued Mark's Atenolol without knowledge of the warnings of the consequences of doing so or in callous disregard of those warnings.

52.      The warnings of the consequences of the abrupt discontinuation of Atenolol were made known to providers by the FDA in the form of "Black box warnings".

53.      Montague did not apprise Mark of the possible risks inherent in the abrupt

discontinuation of the Atenolol

54.     Montague breached the standard of care when she abruptly discontinued the Atenolol without knowledge of why it was prescribed for Mark, the risks inherent in an abrupt cessation of the medication,  and the risks to Mark, specifically,  given his medical history.

55.     Montague breached the standard of care when she failed to apprise Mark of the risks inherent in the abrupt discontinuation of the Atenolol and, as a result, failed to obtain his informed consent to the cessation of the Atenolol.

56.     As a result of Montague's breach of the standard of care, Mark suffered a cardiac event resulting in permanent cardiac damage which will require monitoring and intervention for the remainder of his life.

**COUNT II          MONTAGUE COMMITTED MALPRACTICE WHEN SHE ABRUPTLY DISCONTINUED MARK'S MEDICATION WITHOUT HIS INFORMED CONSENT**

57.     Paragraphs 1 - 56 are incorporated herein by reference.

58.     Montague had a duty to obtain Mark's informed consent prior to discontinuing his medication.

59.     Montague never revealed any of the potential risks involved in abruptly discontinuing his Atenolol prior to or at any time after abruptly discontinuing this medication.

60.     As a result of Montague's failure to provide informed consent, Mark was unaware of the risks to him when she discontinued the medication.

61.     As a result of the abrupt discontinuation of the medication, Mark suffered severe and permanent medical injury.

## COUNT III   KIM HANNAFORD, NURSE PRACTITIONER, WAS NEGLIGENT

### IN HER FAILURE TO DIAGNOSE MARK AND IN HER TREATMENT OF MARK LABARRE

62.     Paragraphs 1 - 61 are incorporated herein by reference.

63.     Hannaford  was employed by  the VA,  providing medical services as a nurse practitioner to individuals being seen/treated at the UCMVHMC at the time of the incidents giving rise to this lawsuit.

64.     Hannaford was the medical provider who evaluated, diagnosed, and treated Mark on January 17, 2018 at UCMVHMC.

65.     When treating a patient, a prudent practitioner would review the patient's medical records, most particularly, his most recent records. At the very least, the standard of care would require a review of the patient's recent medical history.

66.     The medical records of patients seen at MVHMC can be accessed and reviewed by medical and health care providers treating the patient at UCMVHMC.

67.     A prudent provider would have reviewed Mark's medical record, found the notes from his appointment with Montague, and noted the change in his medical regimen, including the cessation of Atenolol..

68.     It is commonly known medication and rashes can be related.

69.     A prudent provider would, at the least, have explored the possibility Mark's rash was related to the Atenolol.

70.     Hannaford either did not review Mark's record or, having reviewed it, failed to consider the possible effect of the cessation of the Atenolol.

71.     Hannaford failed to accurately diagnose Mark's rash.

72.     Hannaford's acts constitute a breach of the standard of care.

73.     The fact his dermatology consult was canceled by the VA lends further support to the VA's knowledge the rash was not the result of a dermatological condition.

74.     As a result of Hannaford's failure to diagnose and breach of the standard of care, Mark suffered a cardiac event resulting in permanent cardiac damage which will require monitoring and intervention for the remainder of his life.

**COUNT IV**    **KRISTIN LABARRE SUFFERED A LOSS OF CONSORTIUM AND OUT OF POCKET EXPENSES AS A RESULT OF THE NEGLIGENCE, MALPRACTICE, FAILURE TO DIAGNOSE AND FAILURE TO OBTAIN INFORMED CONSENT AS SET FORTH IN COUNTS I -IV, ABOVE**

75.    Paragraphs 1 - 74 are incorporated herein by reference.

76.    As noted above, the parties have a long term marriage.

77.    Given the parties ages and  the length and closeness of their relationship at the time of the incident, there is no reason to doubt this marriage would have continued for at least an additional 28.5 years.

78.    This marriage, however,  was dramatically affected by the changes caused by the incident, as Kristin and Mark's lives were forever changed,  The physical changes are readily observable, however the effect of those changes on Kristin are not so easily observed or quantified.  Based upon all of the above, Kristin is requesting $1 million in damages for loss of consortium

79.    In addition, Kristin suffered lost wages, and out of pocket expenses as set forth below in ¶ 93 - 94, below.

**RELIEF**

80.    Paragraphs 1 - 80 are incorporated herein by reference.

       **MARK**

81.    Mark is seeking damages in the amount of  1,582,563.80. The basis and calculation of the damages is set forth below in paragraphs .

82.     Mark was in the hospital for five (5) days and out of work for an additional five (5) days, incurring lost wages of $1903.68.   Mark was seen a total of thirty-six times at the VA in

2018  by either a specialist, primary care provider, or mental health provider.  He was required to miss ½ day of work to attend each of these visits ($3807.36)  and incurred transportation expenses ($144.57).

83.   Mark  had an MRI and stress test at the White River Junction Veteran Administration Medical Center, requiring him to miss a full day of work to attend this visit ($211.52) and incurring $24.98  in transportation expenses, and six (6) times at the NEHC, requiring him to miss six half days of work to attend these visits ($634.56) and incurred $33.84 in transportation expenses.

84.   As a result of the cardiac event, Mark has continued fatigue.  He is unable to do the exercising he did prior to the event and has gained weight as a result.  In addition he continues to suffer from severe emotional distress and suffers flashbacks indicative of PTSD.  He constantly relives the moment when he died and then interferes with his daily functioning.  He is seeking damages in the amount of $500,000 as compensation for this emotional distress and PTSD.

85.   Mark also incurred pain-and-suffering during the incident, in the days following, the route is hospitalization and during his recovery.  He is seeking damages in the amount of $550,000 as compensation for his pain-and-suffering.

86.   As a result of this cardiac event, Mark's quality of life will be impaired and  he will require lifelong surveillance of his ICD function.   In addition, he will continue to incur expenses for the remainder of his life.

87.   Mark's defibrillator battery requires replacement, on average, every six years. In addition the entire device will periodically require replacement. Given Mark's age at the time of

placement of the defibrillator (49) and his life expectancy (78.7),  it is anticipated he will require $5^2$ battery replacements and 1 replacements of the entire device.   In addition, Mark will lose two (2) days of work for each battery change and  five (5) days of work for each defibrillator replacement.

88. Based upon 2018 figures, the cost of a defibrillator replacement would be $159,331.04. Using the 2020 COLA of 1.6%[3] as a basis for estimating the future cost of a replacement, and a life of 14 years, the cost of the replacement would be $198,981.32 and his lost wages for five days of work, presuming an average wage increase of 5% per year, would be $2094.00.

89. Based upon 2017 figures, the cost of a battery replacement with associated procedures would be $38,925.00.  Again, applying the COLA of 1.6%, the cost of the first replacement would be $42,814.50, the cost the of the second replacement would be $47,092.65, the cost of the third replacement would be $51,798.28 , the cost of the fourth replacement would be $56,974.12 , and the cost of the fifth replacement would be $62,667.14, for a total cost of $261,346.69 for all replacements.  Since Mark would lose two days of work each time the battery was replaced, and, again, given a 5% per annum increase in his compensation and the date of the first battery replacement as 2023, Mark's lost wages associated with the first battery replacement would be $489.76, his lost wages associated with the second battery replacement would be $656.32,  his lost wages associated with the third battery  replacement would be $879.52, his lost wages associated

[2] 4.95, however, a partial change is not possible

[3] Source: SSA.gov

with the fourth battery replacement would be $1178.72, and his lost wages associated with the fifth battery replacement would be $1579.52, with a total of $4783.84 in lost wages associated with the five battery replacements.

90.   As a result of his cardiac event, Mark will also require additional medical appointments each year. Each year, he will require two visits with cardiology, three visits with psychiatry, four visits relating to the monitoring of his defibrillator, two visits with his primary care physician in addition to his annual visit. The total annual cost associated with the interpretation of the defibrillator data as of 2018, was $1145.82; over the course of Mark's life expectancy, using a 1.6% adjustment, and a life expectancy of 27.5 years, the annual cost associated with this item will be $1772.94, or, $48,755.85 over his life expectancy. As a result, Mark will lose eleven (11) half days of work each year and incur mileage expenses eleven (11) times to travel to his appointments. Using his current rate of pay and a multiplier to take into account future increases, it is anticipated he will suffer an additional $465.30 in lost wages each year, or a total of $8840.70 in lost wages during the rest of his working life. In addition, it is anticipated he will incur mileage costs in the amount of $950.95 during the same period of time.

91.   Based on the above and the attachments hereto, Mark is seeking damages in the total amount of $1,582,563.80.

   **KRISTIN**

92.   Paragraphs 1 - 91 are incorporated herein by reference.

93.   Due to Mark's cardiac incident, Kristin lost seventeen days of work for which she was not paid. At her daily rate of $250.00/day, her lost wages totaled $4,250.00. In addition,

Kristin was penalized $50.00 per day for missing time for a total of $850.00.

94.     Kristin's incurred $102.60 in  milage expenses for taking Mark to his appointments and driving back and forth to the hospital while he was hospitalized and incurred an additional mileage expense of  $144.00 driving Mark back and forth to work.

95.     For the reasons set forth in paragraphs 76- 78,  Kristin is seeking $1,000,000.00 for loss of consortium.

96.     Based upon the above, Kristin is seeking damages in the amount of $1,004,746.66.

NOW. WHEREFORE, the Plaintiffs request:

A.      A finding of negligence against Laurie Montague, M.D., and Kim Hannaford, NP as demonstrated by:

1.      Laurie Montague, M.D.  in her treatment of Mark LaBarre as demonstrated by her breach of the standard of care relating to the discontinuance of the drug Atenolol, and failure to appropriately provide treatment, monitoring and other medical services;

2.      Laurie Montague, M.D.  in her failure to inform Mark LaBarre of the risks inherent in the abrupt cessation of Atenolol and failure to obtain his informed consent to the cessation of the Atenolol;

3.      The negligence of Laurie Montague was the proximate cause of Mark LaBarre's cardiac incident as a result of which Mark suffered psychological damages and permanent medical and physical damages;

4.      Kim Hannaford as demonstrated by her breach of the standard of care by failing to diagnose Mark's rash correctly, with the result that the trajectory to the impending

cardiac incident continued without impediment and as a result of which

negligence, Mark suffered psychological damages and permanent medical and

physical damages'

B.     Kristin suffered a loss of consortium due to the negligence of Montague and/or

Hannaford;

C.     Mark be awarded the sum of $1,582,563.80 in damages as set forth in ¶¶ 83 - 93, above;

D.     Kristin be awarded the sum of $1,000,000.00 as loss of consortium and $4746.66 for

expenses pursuant to ¶95 - 96; and

E.     For whatever further relief justice may require.

The parties are NOT requesting a jury trial.

Respectfully submitted,              February 5, 2021
Mark LaBarre and Kristin LaBarre,
By and through their attorney,

/s/ Nancy S. Tierney    NH Bar #2552            /s/   Mark LaBarre
Nancy S. Tierney
79 Hanover Street
Lebanon, NH 03766                   /s/ Kristin LaBarre
603-448-4722; 781-254-9003
nstierney4@aol.com